IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Case No. 21-cv-03439-PAB-NRN

KATRINA BARKER,

      Plaintiff,

v.

NATHANIEL MOSS, in his individual and official capacity,
ALEXANDRE DIZ, in his individual and official capacity, and
CITY OF AURORA, COLORADO, a municipality,

      Defendants.

_____

**ORDER**
_____

      This matter is before the Court on Defendant City of Aurora's Motion to Dismiss

Plaintiff's Second Amended Complaint with Request for Jury Trial [Docket No. 54] and

Defendants Moss and Diz' Motion to Dismiss Plaintiff's Second Amended Complaint

with Request for Trial by Jury [Docket No. 56].  Plaintiff Katrina Barker responded to

both motions.  Docket Nos. 61, 62.  Defendant City of Aurora ("the City" or "Aurora") and

defendants Nathaniel Moss ("Officer Moss") and Alexandre Diz ("Officer Diz") replied.

Docket Nos. 63, 64.  The Court has jurisdiction under 28 U.S.C. § 1331.

I.      **BACKGROUND**[1]

      On January 21, 2020, Ms. Barker called the Wheat Ridge Police Department to

report a harassment incident.  Docket No. 47 at 4, ¶ 11.  Throughout the conversation,

_____

[1] The facts below are taken from plaintiff's second amended complaint, Docket No. 47,
and are presumed to be true for purposes of ruling on defendants' motions to dismiss.
*See Brown v. Montoya*, 662 F.3d 1152, 1162 (10th Cir. 2011).

the Wheat Ridge police officer thought Ms. Barker was "extremely agitated, hysterical, and she sounded intoxicated." *Id*., ¶ 12.  After determining that Ms. Barker resided in Aurora, the Wheat Ridge officer called the Aurora Communications Center to request a welfare check on Ms. Barker due to her "possible intoxication."  *Id*., ¶ 13.  Officer Moss and Officer Diz (collectively "the officers") were dispatched to Ms. Barker's residence that evening.  *Id*., ¶ 15.

On January 21, 2020, at 8:51 p.m., Officers Moss and Diz arrived at Ms. Barker's apartment complex and approached her apartment, which was located on the first floor. *Id*., ¶ 16.  The officers were wearing their body cameras and the cameras were recording.  *Id*. at 5, ¶ 17.  All the lights in Ms. Barker's apartment were off.  *Id*., ¶ 18. Officers Moss and Diz looked through the blinds and did not observe anyone or any movement.  *Id*., ¶ 19.  The officers did not announce themselves as police.  *Id*., ¶ 20. The officers knocked on the door, rang the doorbell, and jiggled the locked doorknob; however, there was no response from within the residence.  *Id*., ¶¶ 21-24.

With their flashlights on, the officers walked to the south side of the apartment and approached the sliding glass door.  *Id*., ¶ 26.  Ms. Barker kept the blinds closed on her sliding glass door to protect the area from observation.  *Id*. at 27, ¶ 184.  Officers Moss and Diz looked through the blinds of the sliding glass door and through the kitchen window, but did not observe any movement or hear any voices.  *Id*. at 5, ¶ 27. The officers shined their lights through the glass door and discussed out loud how to enter the residence.  *Id*., ¶¶ 28-29.  The officers "tested the sliding glass door" and the door opened approximately six to twelve inches before the safety bar stopped the door. *Id*., ¶ 30.  The officers reached into the residence and rattled the blinds on the sliding

glass door in order to open the door further and Defendant Moss said, "I guess we're not going to be able to get in this way either."  *Id*. at 6, ¶¶ 32-33.

For the first time, Officer Diz announced the police presence by stating, "Hello! Police! Come to the front door!"  *Id*., ¶ 34.  Ms. Barker arrived at the sliding glass door within mere seconds.  *Id*., ¶ 35.  When asked why she did not come to the door sooner, Ms. Barker explained that she did not know it was the police.  *Id*., ¶¶ 37-38.  The officers lied by claiming that they had announced themselves many times.  *Id*., ¶ 39.  Ms. Barker was asleep with her children before the officers arrived, and she was frightened when she heard two unknown men attempting to enter her home.  *Id*. at 7, ¶¶ 41-42.  Ms. Barker became noticeably more upset and confused when the officers lied to her.  *Id*., ¶ 43.  Ms. Barker then closed the sliding glass door to protect herself.  *Id*., ¶ 44.

Officers Moss and Diz continued asking Ms. Barker questions, and therefore she opened the sliding glass door to answer their questions and closed the door after each answer.  *Id*., ¶ 45.  Whenever Ms. Barker opened the door, the officers pointed their flashlights in her face.  *Id*. at 8, ¶ 51.  Ms. Barker asked the officers to stop pointing the light in her face.  *Id*., ¶ 52.  Ms. Barker reached beyond the door a couple times to take photographs of the officers on her phone.  *Id*., ¶ 53.  As the officers pointed the light in her face, Ms. Barker "swatted at the flashlights" and the officers leaned back each time to avoid contact with Ms. Barker.  *Id*., ¶¶ 54-55.

One of the times Ms. Barker opened the sliding glass door, Officer Moss placed his foot in front of the sliding glass door to maintain access to the apartment.  *Id*. at 7, ¶ 46.  Ms. Barker directed Officer Moss to remove his foot from her door and asked both officers to leave her property.  *Id*., ¶¶ 47-49.  Officers Moss and Diz remained at the

property.  *Id*., ¶ 50.  The officers continued asking Ms. Barker questions and she became more visibly upset that they remained on her property.  *Id*. at 8, ¶¶ 56-57.  The officers falsely claim in their reports that Ms. Barker's speech was slurred, but the body camera footage shows that her speech was never slurred.  *Id*., ¶¶ 58-59.  There was also no indication that Ms. Barker was intoxicated as the Wheat Ridge officer suspected.  *Id*., ¶ 60.  Her blood alcohol content was 0.0.  *Id*. at 9, ¶ 62.

Ms. Barker again demanded that the officers leave her residence.  *Id*., ¶ 63.  Officer Moss then left the sliding glass door area and stated that he is "going to kick the front door."  *Id*., ¶¶ 64-65.  Officer Diz leaned in towards the partially open sliding glass door, placed his hand on the door handle, and whispered that they "were going to come into her home and take her children" and they were "going to kick the door."  *Id*., ¶¶ 66-68.  Ms. Barker yelled that the officers could not enter her home and she "swatted at Defendant Diz."  *Id*., ¶ 69.  Unlike before, Officer Diz "leaned in for the contact" and after the contact was "clumsily made," Officer Diz excitedly and triumphantly called out to Officer Moss that he had been "assaulted" by Ms. Barker.  *Id*. at 9-10, ¶¶ 70-72.

Officer Diz then ran towards the front door and Officer Moss kicked in the front door.  *Id*. at 10, ¶¶ 73-74.  When Officer Moss kicked in the front door, "it made violent contact with Ms. Barker's forehead," and Ms. Barker screamed and fell backwards towards the floor with blood jetting from her forehead.  *Id*., ¶¶ 77-78.  Ms. Barker had a "huge, bleeding hematoma on her forehead."  *Id*., ¶ 79.  Officer Diz then arrived at the front door and the officers yelled at Ms. Barker to get on the floor.  *Id*., ¶¶ 80-81.  The officers then "tackled Ms. Barker, who was still prone on the floor with a bleeding forehead, and piled on her and handcuffed her."  *Id*., ¶ 83.  Ms. Barker's "screams of

distress intensified once the handcuffs were fully in place." *Id*. at 11, ¶ 87.  Ms. Barker's children came to the living room and were crying as they watched their mother being placed in handcuffs. *Id*., ¶ 88.

Officers Moss and Diz arrested Ms. Barker for assault in the second degree and criminal attempt for assault in the second degree under Colo. Rev. Stat. § 18-3-203(1)(c). *Id*. at 30, ¶ 204.  The officers transported Ms. Barker to the hospital to treat her head injury. *Id*. at 12, ¶ 95.  A blood alcohol test conclusively revealed there was no alcohol in her system. *Id*., ¶¶ 98-99.  Officers Moss and Diz later transported Ms. Barker to the Aurora Municipal Jail, where she was held on bond for the assault charges. *Id*. at 12-13, ¶ 100.  The officers filed a complaint against Ms. Barker in the District Court for Arapahoe County, Colorado and a criminal case was initiated against Ms. Barker, but the case was later dismissed by the deputy district attorney. *Id*. at 13, 17, 30, ¶¶ 107, 125, 206.

Neither officer had a warrant to lawfully enter the residence. *Id*. at 10, ¶ 75.  At all relevant times, there was no arrest warrant for Ms. Barker. *Id*. at 18, ¶ 127.  There was no evidence suggesting that anyone inside Ms. Barker's home was in immediate danger or seriously injured. *Id*. at 28, ¶ 196.

Ms. Barker brings five claims under 42 U.S.C. § 1983, alleging violations of her rights under the Fourth and Fourteenth Amendments. *Id*. at 19, ¶ 135.  Ms. Barker asserts (1) an unlawful arrest claim against all defendants; (2) an excessive force claim against all defendants; (3) an unreasonable search claim against all defendants; (4) a malicious prosecution claim against all defendants; and (5) a municipal liability claim against the City. *Id*. at 19-34.

5

## II.    LEGAL STANDARD

### A.  Motion to Dismiss

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must allege enough factual matter that, taken as true, makes the plaintiff's "claim to relief . . . plausible on its face." *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "The 'plausibility' standard requires that relief must plausibly follow from the facts alleged, not that the facts themselves be plausible." *RE/MAX, LLC v. Quicken Loans Inc.*, 295 F. Supp. 3d 1163, 1168 (D. Colo. 2018) (citing *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008)).  Generally, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Twombly*, 550 U.S. at 555) (alterations omitted).  A court, however, does not need to accept conclusory allegations. *See, e.g.*, *Hackford v. Babbit*, 14 F.3d 1457, 1465 (10th Cir. 1994) ("[W]e are not bound by conclusory allegations, unwarranted inferences, or legal conclusions.").

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quotations and alterations omitted); *see also Khalik*, 671 F.3d at 1190 ("A plaintiff must nudge [his] claims across the line from conceivable to plausible in order to survive a motion to dismiss." (quoting *Twombly*, 550 U.S. at 570)).  If a complaint's allegations are "so general that they encompass a wide swath of conduct, much of it innocent," then

plaintiff has not stated a plausible claim. *Khalik*, 671 F.3d at 1191 (quotations omitted). Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Bryson*, 534 F.3d at 1286 (alterations omitted).

### B. Qualified Immunity

"Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). A court should resolve questions of qualified immunity at the earliest possible stage of litigation. *Anderson v. Creighton*, 483 U.S. 635, 646 n.6 (1987). However, a plaintiff facing a qualified immunity challenge still does not have a heightened pleading standard. *Currier v. Doran*, 242 F.3d 905, 916-17 (10th Cir. 2001).

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Thus, to survive a motion to dismiss under Rule 12(b)(6) "where a qualified immunity defense is implicated, the plaintiff 'must allege facts sufficient to show (assuming they are true) that the defendants plausibly violated their constitutional rights.'" *Hale v. Duvall*, 268 F. Supp. 3d 1161, 1164 (D. Colo. 2017) (quoting *Robbins v. Oklahoma ex rel. Dep't of Human Servs.*, 519 F.3d 1242, 1249 (10th Cir. 2008)). When

a defendant raises the defense of qualified immunity, a "plaintiff carries a two-part burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct."  *T.D. v. Patton*, 868 F.3d 1209, 1220 (10th Cir. 2017) (internal quotation marks omitted).  Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case."  *Pearson*, 555 U.S. at 236.

III.   **ANALYSIS**

A. **Documents Outside the Pleadings**

Officer Moss and Officer Diz request that the Court take judicial notice of their body-worn camera footage from this incident.  Docket No. 56 at 5 n.3; Docket No. 64 at 2 n.1.  Ms. Barker does not object to the Court considering the body-worn camera footage.  Docket No. 61 at 1.

Generally, if a court considers matters outside the complaint in deciding a Rule 12(b)(6) motion, "the motion must be treated as one for summary judgment under Rule 56."  Fed. R. Civ. P. 12(d).  However, "if a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss."  *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997).  However, the Court has "broad discretion in determining whether or not to accept materials beyond the pleadings."  *Lowe v. Town of Fairland*, 143 F.3d 1378, 1381 (10th Cir. 1998); *see also*

8

*Prager v. LaFaver*, 180 F.3d 1185, 1189 (10th Cir. 1999) ("*GFF Corp*. did not purport to decide whether consideration of materials appended to a motion to dismiss is mandatory or discretionary. . . . We agree with our sister circuits that if a defendant attaches to a 12(b)(6) motion materials referred to by the plaintiff and central to his claim, the court has discretion to consider such materials.").  When a court takes judicial notice of documents, it may do so only to "show their contents, not to prove the truth of the matters asserted therein."  *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006).  The Court will exercise its discretion and decline to take judicial notice of the body-worn camera footage of Officers Moss and Diz.  At the motion to dismiss stage, the Court will examine the well-pleaded allegations in Ms. Barker's complaint.  The officers may present this body-worn camera evidence at the summary judgment stage.

### B.  Officer Moss and Officer Diz

Ms. Barker asserts four claims against Officer Moss and Officer Diz in their individual and official capacities.  Docket No. 47 at 1, 19-34.  Aurora argues that Ms. Barker cannot bring claims against Officers Moss and Diz in their official capacities because she also names the City as a defendant.  Docket No. 54 at 4-5.  Ms. Barker agrees that the official capacity claims against the officers should be dismissed.  Docket No. 62 at 5 ("Plaintiff concedes the authority and explanation in *Silverstein* requires the removal of the official-capacity suit when the government entity receives notice and an opportunity to respond.").  Accordingly, the Court will dismiss the claims against Officer Moss and Officer Diz in their official capacities.  *See Silverstein v. Fed. Bureau of Prisons*, 704 F. Supp. 2d 1077, 1087 (D. Colo. 2010) ("Where . . . the entity is also

named, there is no need for an official-capacity claim.").  The officers assert qualified

immunity on all claims against them in their individual capacities.  Docket No. 56 at 3.

### 1.  Claim Three – Fourth Amendment Unreasonable Search

The Fourth Amendment protects "[t]he right of the people to be secure in their

persons, houses, papers, and effects, against unreasonable searches and seizures."

U.S. Const. Amend. IV.  At the "very core" of the Fourth Amendment is "the right of a

man to retreat into his own home and there be free from unreasonable governmental

intrusion."  *Florida v. Jardines*, 569 U.S. 1, 6 (2013).  "Searches inside a home without a

warrant are presumptively unreasonable."  *Lundstrom v. Romero*, 616 F.3d 1108, 1128

(10th Cir. 2010).  Ms. Barker argues that the officers conducted an unlawful search –

without a warrant and absent exigent circumstances – when they entered the curtilage

of her residence, opened the sliding glass door, reached inside the residence, and

placed a foot over the door sill.  Docket No. 47 at 5-7, 27, ¶¶ 30, 32, 46, 181-186; *see*

*also* Docket No. 61 at 13.  Officers Moss and Diz do not dispute that a search occurred,

but rather argue that their entry into Ms. Barker's residence was justified by exigent

circumstances.  Docket No. 56 at 14-17.

Exigent circumstances can justify a search without a warrant if: 1) the officer had

an objectively reasonable basis to believe there was an immediate need to protect the

lives or safety of himself or others; and 2) if the manner and scope of the search was

reasonable.  *Lundstrom*, 616 F.3d at 1124 (citing *United States v. Najar*, 451 F.3d 710,

717 (10th Cir. 2006)).  Defendants have the burden of proof on exigent circumstances.

*Id*.  Officers Moss and Diz argue that exigent circumstances existed to partially open the

door because they were "actively pursuing an investigation into a well-being check on

Plaintiff's children."  Docket No. 56 at 16.  Citing the body camera footage, they further argue that exigent circumstances warranted entry into the front door because the officers were not able to complete the well-being check on plaintiff's children, were not able to see the children, and plaintiff was behaving in an "unusually aggressive and belligerent manner."  *Id*. at 17-18.

The Court finds that, based on the well-pleaded facts in the complaint, there were no exigent circumstances to justify the officers' search of Ms. Barker's home.  The complaint alleges that the officers were dispatched to the residence to conduct a welfare check on Ms. Barker due to her "possible intoxication."  Docket No. 47 at 4, ¶¶ 13, 15.  The complaint contains no facts suggesting that the basis of the welfare check was for the immediate safety of Ms. Barker's children.  *See generally id*.  The complaint alleges that, although Ms. Barker was visibly upset during her contact with the officers, her speech was never slurred, her blood alcohol content was 0.0, and there was no indication that she was intoxicated by alcohol as the Wheat Ridge officer had suspected.  *Id*. at 8-9, ¶¶ 57-58, 60-62.  Ms. Barker repeatedly demanded that the officers leave her property.  *Id*. at 7-10, 28, ¶¶ 49, 56, 63, 82, 194.  The complaint contains no allegations suggesting that anyone inside Ms. Barker's home was in immediate danger or seriously injured.  *See generally id*.  And the complaint contains no allegations that anyone asked the officers to check on the well-being of the children or that Ms. Barker threatened her children.  *See generally id*.  Based on the well-pleaded facts in the complaint, the officers did not have an objectively reasonable basis to believe there was an immediate need to protect the lives or safety of Ms. Barker or her children.  *See Lundstrom*, 616 F.3d at 1124.  Therefore, exigent circumstances did not

justify the officers' actions of opening her sliding glass door and reaching inside the residence.  *See id.*  The Court therefore finds that Ms. Barker has plausibly alleged a violation of her Fourth Amendment right to be free from unreasonable searches.

At the time of this incident, the law was clearly established that officers need either a warrant or a valid exception to the warrant requirement in order to enter and search a person's home.  *Id.* at 1129.  Based on the well-pleaded allegations in the complaint, there were no exigent circumstances to enter Ms. Barker's home.  A reasonable officer would have understood that the entry into Ms. Barker's home violated her Fourth Amendment right to be free from unreasonable searches, and therefore, Officer Moss and Officer Diz are not entitled to qualified immunity on this claim.

## 2.  *Claim One – Fourth Amendment Unlawful Arrest*

A Fourth Amendment "seizure" of one's person occurs when a government actor terminates one's freedom of movement through intentional means.  *See Brower v. Cnty. of Inyo*, 489 U.S. 593, 596–97 (1989); *Scott v. Harris*, 550 U.S. 372, 381 (2007).  An arrest requires probable cause to believe that the arrestee committed a crime.  *Fogarty v. Gallegos*, 523 F.3d 1147, 1156 (10th Cir. 2008).  An arrest inside of a home without a warrant is "presumptively unreasonable."  *Payton v. New York*, 445 U.S. 573, 586 (1980).  However, "[o]fficers may enter an individual's home without consent and conduct a warrantless arrest if both probable cause and exigent circumstances exist."  *United States v. Reeves*, 524 F.3d 1161, 1169 (10th Cir. 2008) (citing *Payton*, 445 U.S. at 590).  In determining whether an officer has probable cause for an arrest, the Court must "examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer,

amount to probable cause." *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (internal quotations marks and citation omitted).  Probable cause depends on the totality of the circumstances and is not a high bar.  *Id.*  "Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense."  *York v. City of Las Cruces*, 523 F.3d 1205, 1210 (10th Cir. 2008) (quoting *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995)).  "[T]he relevant question is whether a 'substantial probability' existed that the suspect committed the crime, requiring something 'more than a bare suspicion.'" *Kerns v. Bader*, 663 F.3d 1173, 1188 (10th Cir. 2011) (citations omitted).

There was no arrest warrant for Ms. Barker.  Docket No. 47 at 18, ¶ 127.  Ms. Barker argues that the officers did not have probable cause or exigent circumstances to justify the warrantless arrest inside her home because they had no "reasonable basis for believing Plaintiff posed an immediate threat to them, herself, or her children." Docket No. 61 at 15.  Officers Moss and Diz argue that they had probable cause to arrest plaintiff because she assaulted or attempted to assault Officer Diz when she "intentionally made a 'swatting' type of physical contact with Officer Diz."  Docket No. 56 at 19-20.  The officers argue that the arrest was made after lawful entry into Ms. Barker's apartment pursuant to exigent circumstances regarding the safety of the children.  Docket No. 64 at 6-7.

Under Colorado law, a person commits the crime of assault in the second degree if, "[w]ith intent to prevent one whom he or she knows, or should know, to be a peace officer. . . from performing a lawful duty, he or she intentionally causes bodily injury to

13

any person."  Colo. Rev. Stat. § 18-3-203(1)(c).  Ms. Barker's complaint states that the officers identified themselves as police officers at her sliding glass door.  Docket No. 47 at 6, ¶ 34.  After the officers told Ms. Barker that they were going to kick in her front door, "Ms. Barker yelled that the Defendants could not enter her home and swatted at Defendant Diz."  *Id.* at 9, ¶ 69.  The complaint admits that "contact was clumsily made." *Id.*, ¶ 71.  These facts in the complaint support a finding of probable cause to arrest Ms. Barker for assault.  A reasonable officer at the time of the incident could believe that Ms. Barker intended to injure Officer Diz by swatting at him and making contact with his body.  *See Rojas ex rel. Rojas-Ramirez v. Anderson*, No. 11-cv-01200-DME-KLM, 2012 WL 2153941, at *3 (D. Colo. June 13, 2012) (finding that probable cause existed to arrest the suspect for attempted assault under Colo. Rev. Stat. § 18-3-203(1)(c) because a reasonable officer could believe that the suspect intended to assault the officer when he lunged his arm).  As a result, probable cause existed to believe that Ms. Barker had committed an assault.  *See York*, 523 F.3d at 1210.[2]

However, the presence of probable cause does not end the Court's inquiry because exigent circumstances must also be present to effectuate a warrantless arrest inside of a suspect's home.  *See Reeves*, 524 F.3d at 1169.  Here, even though the officers had probable cause to arrest Ms. Barker for assaulting Officer Diz, no exigent circumstances existed to permit the officers to enter her home to effectuate the arrest. *See id.*  As discussed previously, based on the well-pleaded facts in the complaint, the

---

[2] Although Ms. Barker disputes the exact chronology of the officers' entry into her home, Ms. Barker appears to concede in her response that an assault or attempted assault occurred.  *See* Docket No. 61 at 13 ("To be clear, Officer Moss was already on his way to force his way through the front door when the assault or attempted assault occurred.").

officers did not have an objectively reasonable basis to believe there was an immediate need to protect the safety of Ms. Barker or her children.  The officers articulate no other exigent circumstances, aside from the safety of the children, to enter Ms. Barker's home.  *See generally* Docket No. 56.  Ms. Barker therefore has adequately pled a Fourth Amendment violation because the officers entered her home to make a warrantless arrest when there were no exigent circumstances.  *See Reeves*, 524 F.3d at 1165 ("[A]bsent exigent circumstances, police officers may not enter an individual's home without consent to make a warrantless routine felony arrest even if probable cause to arrest the individual exists.") (citing *Payton*, 445 U.S. at 576).

At the time of this incident, the law was clearly established that both probable cause and exigent circumstances were required for the officers to arrest Ms. Barker inside her home without a warrant.  *See Reeves*, 524 F.3d at 1169; *Payton*, 445 U.S. at 590; *see also Lundstrom*, 616 F.3d at 1124-25 (holding that the warrantless seizure of a homeowner at his residence during a child welfare check was not justified by exigent circumstances because the homeowner posed no immediate threat of harm to anyone). Consequently, the officers are not entitled to qualified immunity on the unlawful arrest claim.

### 3.  *Claim Two – Fourth Amendment Excessive Force*

The Court next considers Ms. Barker's excessive force claim.  "To state a claim of excessive force under the Fourth Amendment, a plaintiff must show both that a seizure occurred and that the seizure was unreasonable."  *Bella v. Chamberlain*, 24 F.3d 1251, 1255 (10th Cir. 1994) (quotation omitted).  The relevant inquiry is whether the force used by the officers was "reasonable under the facts and circumstances

presented." *See Fogarty*, 523 F.3d at 1159 (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  When examining a claim of excessive force, a "court assesses the reasonableness of an officer's conduct from the perspective of a reasonable officer on the scene, acknowledging that the officer may be forced to make split-second judgments in certain difficult circumstances." *Buck v. City of Albuquerque*, 549 F.3d 1269, 1287-88 (10th Cir. 2008) (quoting *Marquez v. City of Albuquerque*, 399 F.3d 1216, 1220 (10th Cir. 2005)).  In evaluating the reasonableness of the force used during a seizure, courts consider a series of factors including "the severity of the crime at issue, whether the suspect poses an immediate threat to safety of the officers and others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.  An excessive force claim is separate from a claim for unlawful arrest.  *Mglej v. Gardner*, 974 F.3d 1151, 1165 (10th Cir. 2020).

Ms. Barker argues that the officers used excessive force on two occasions: (1) when the officers "broke in through her front door;" and (2) when the officers "tackled her on the floor to place her in handcuffs."  Docket No. 61 at 5.  Ms. Barker generally argues that the *Graham* factors weigh in her favor on both claims because there was no crime at issue, she did not threaten the officers, and she did not actively resist arrest or attempt to flee.  *Id.* at 7-8.

### a)  Breaking In Through Front Door

Officers Moss and Ditz argue that Ms. Barker has failed to allege a viable Fourth Amendment excessive force violation based on breaking through the door because she fails to cite any legal precedent that breaking through a door constitutes excessive force.  Docket No. 64 at 2-3.  To the extent Ms. Barker alleges excessive force based

on the injury to her head, the officers argue that this claim fails because the contact between the door and Ms. Barker's forehead was accidental.  *Id*. at 3.

The Court agrees with the officers' arguments.  Ms. Barker failed to cite any precedent and the Court's own inquiry failed to find any precedent holding that an officer's action of breaking down a door constitutes excessive force.  To the extent that Ms. Barker argues excessive force based on the door hitting her head, this claim fails under *Torres v. Madrid*, 141 S. Ct. 989 (2021).  In *Torres*, the Supreme Court held that "[a] seizure requires the use of force *with intent to restrain*.  Accidental force will not qualify. . . [n]or will force intentionally applied for some other purpose." *Torres*, 141 S. Ct. at 998 (emphasis in original).  Here, the complaint alleges no facts that support an inference that Officer Moss kicked the door with the intent to restrain Ms. Barker.  *See generally* Docket No. 47.  The complaint states that "Defendant Moss announced that he was going to force his way into the front door, and he left the sliding glass door area."  *Id*. at 9, ¶ 64.  At this time, Ms. Barker was still at the sliding glass door area talking with Officer Diz.  *See id*., ¶¶ 66-69.  There are no facts in the complaint suggesting that Officer Moss was aware Ms. Barker moved to the front door before he kicked the door in.  *See generally id*.  Since Ms. Barker has failed to plead that Officer Moss kicked the door with the intent to restrain her, she has failed to state a claim for excessive force.  Consequently, Officers Moss and Diz are entitled to qualified immunity on plaintiff's claim of excessive force based on their actions of breaking in through the front door.

### b)  Tackling Plaintiff

The Court will next analyze whether Ms. Barker has stated a plausible claim for excessive force based on the officers tackling her.[3]  The complaint states that, when Officer Moss kicked in the front door, "it made violent contact with Ms. Barker's forehead," and Ms. Barker screamed and fell backwards towards the floor with blood jetting from her forehead.  Docket No. 47 at 10, ¶¶ 77-78.  Officer Diz then arrived at the front door and the officers yelled at Ms. Barker to get on the floor.  *Id.*, ¶¶ 80-81.  The officers "tackled Ms. Barker, who was still prone on the floor with a bleeding forehead, and piled on her and handcuffed her."  *Id.*, ¶ 83.

The Court finds that two of the *Graham* factors weigh in Ms. Barker's favor.  *See Graham*, 490 U.S. at 396.  The first *Graham* factor, the severity of the crime at issue, weighs in favor of the officers because the officers arrested Ms. Barker for assault in the second degree and criminal attempt to assault a police officer.  *See* Docket No. 47 at 30, ¶ 204.  However, the second and third *Graham* factors, whether the suspect poses an immediate threat to the safety of the officers and whether the suspect is actively resisting arrest or attempting the evade arrest by flight, weigh in favor of Ms. Barker.  The complaint states that, when the officers tackled Ms. Barker inside the house, she was "still prone on the floor with a bleeding forehead."  *Id*. at 10, ¶ 83.  Although Ms.

---

[3] Officers Moss and Diz argue that, although Ms. Barker's complaint contains an allegation of tackling to the floor prior to the handcuffing, the body-worn camera video contradicts her assertion.  Docket No. 64 at 3-4.  Specifically, they claim that the video shows that "Plaintiff was handcuffed within several seconds while she was standing next to her couch . . . [a]fter handcuffing, Plaintiff was subsequently placed on the floor." *Id*. at 4.  The Court has declined to consider the body-worn camera footage submitted by the defendants and is only considering the well-pleaded allegations in plaintiff's complaint.

Barker had previously swatted at Officer Diz, *see id*. at 9, ¶ 69, the complaint contains no allegations suggesting that she posed an immediate threat to the officers or was actively resisting arrest when she was "prone on the floor." Based on the well-pleaded allegations in the complaint, the tackling under these circumstances was unreasonable, and therefore, Ms. Barker has stated a claim for excessive force. *See also French v. City of Cortez*, 361 F. Supp. 3d 1011, 1033-34 (D. Colo. 2019) (holding that plaintiff met his summary judgment burden of demonstrating excessive force where officer tackled him inside his home during the arrest and there was no indication he was attempting to flee or posed a risk to others).

Ms. Barker cites several cases in support of her argument that the law was clearly established that defendants violated her constitutional rights. Docket No. 61 at 10-11. However, the Court finds that each case is distinguishable. In *Lundstrom*, the court held that plaintiff stated a viable claim for excessive force based on the officer's actions of pressing him against a vehicle, shoving him to the ground, pressing an elbow or knee against his head, and twisting his arm. *Lundstrom*, 616 F.3d at 1126-27. A crucial difference between this case and *Lundstrom* is that *Lundstrom* did not involve allegations of tackling. *See generally id*. Furthermore, the Court fails to see how *Storey v. Taylor,* 696 F.3d 987 (10th Cir. 2012), supports Ms. Barker's case because the court there found that the plaintiff had abandoned his excessive force claim on appeal. *See Storey,* 696 F.3d at 991-92.

The Court finds *Morris v. Noe*, 672 F.3d 1185 (10th Cir. 2012), to be the most informative case. In *Morris*, the Tenth Circuit held it was clearly established that the officer violated the plaintiff's Fourth Amendment rights when he forcefully tackled

plaintiff to the ground for suspected assault even though plaintiff posed little threat to the officers or others, the officer did not warn plaintiff, and plaintiff was not resisting arrest. *Morris*, 672 F.3d at 1195-97.  Similarly, here, the officers were arresting Ms. Barker for assault or attempted assault on Officer Diz, yet she posed little threat to the officers and was not resisting arrest when she was "prone on the floor with a bleeding forehead." *See* Docket No. 47 at 10, ¶ 83.  Based on *Morris*, any reasonable officer should have understood that tackling Ms. Barker when she was prone on the floor was an excessive use of force in violation of the Fourth Amendment.  As a result, the officers are not entitled to qualified immunity for the tackling excessive force claim at this stage.

### 4.  Claim Four – Fourth Amendment Malicious Prosecution

In order to state a claim for malicious prosecution, a plaintiff must show that: "(1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages."  *Wilkins v. DeReyes*, 528 F.3d 790, 799 (10th Cir. 2008) (citing *Novitsky v. City of Aurora*, 491 F.3d 1244, 1258 (10th Cir. 2007)).  A court may infer malice if a defendant causes the prosecution without arguable probable cause.  *Stonecipher v. Valles*, 759 F.3d 1134, 1146 (10th Cir. 2014).

Officers Moss and Diz argue that Ms. Barker fails to adequately plead elements three and four, the absence of probable cause and malice.  Docket No. 56 at 18.  The Court previously found that the officers had probable cause to arrest Ms. Barker for assault.  As a result, Ms. Barker has failed to establish the third element of her

malicious prosecution claim.  Therefore, the Court will dismiss claim four against Officers Moss and Diz in their individual capacities.

### C.  City of Aurora

Ms. Barker also brings a municipal liability claim against Aurora for failure to train its police officers.  Docket No. 47 at 33-34, ¶¶ 225-231; Docket No. 62 at 3.  Aurora moves to dismiss for failure to state a claim.  Docket No. 54 at 2.

Local governments may not be sued under 42 U.S.C. § 1983 on a theory of *respondeat superior*.  *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 692 (1978). Instead, local governing bodies can be sued directly only where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id*. at 690 (footnote omitted).  "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id*. at 694.

In order to state a claim for municipal liability under § 1983 for the actions of a municipal employee, a party must allege sufficient facts to demonstrate that it is plausible (1) that the municipal employee committed a constitutional violation; and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation.  *Jiron v. City of Lakewood*, 392 F.3d 410, 419 (10th Cir. 2004).  A municipal policy or custom can take the form of

> (1) a formal regulation or policy statement; (2) an informal custom amoun[ting] to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions

of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions – and the basis for them – of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused.

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (citations omitted).

A plaintiff must also demonstrate "a direct causal link between the policy or custom and the injury alleged." *Id.* (internal quotation marks omitted). "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Bryan Cnty. Bd. of Comm'rs v. Brown*, 520 U.S. 397, 405 (1997). "The causation element is applied with especial rigor when the municipal policy or practice is itself not unconstitutional, for example, when the municipal liability claim is based upon inadequate training, supervision, and deficiencies in hiring." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013) (internal quotation marks omitted).

### 1. Constitutional Violation

To maintain a municipal liability claim, a plaintiff must first show that a municipal employee violated the plaintiff's constitutional rights. *See Jiron*, 392 F.3d at 419. The Court previously found that Ms. Barker adequately pled constitutional violations against Officers Moss and Diz for unlawful arrest, unreasonable search, and excessive force for the tackling. The first element of the municipal liability claim has therefore been met.

### 2.  *Municipal Policy or Custom – Failure to Train*

To state a *Monell* claim based on the failure to train or supervise, "a plaintiff must sufficiently allege that the failure 'amounts to deliberate indifference to the rights of persons with whom the police come into contact.'" *Rehberg v. City of Pueblo*, No. 10-cv-00261-LTB-KLM, 2012 WL 1326575, at *4 (D. Colo. Apr. 17, 2012) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).  However, a "municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011); *see also Okla. City v. Tuttle*, 471 U.S. 808, 822–823 (1985) (plurality opinion) (discussing how a policy of inadequate training is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*").

"Deliberate indifference" is an exacting standard of fault.  *See Bryan Cnty.*, 520 U.S. at 410.  It requires showing that a municipal actor disregarded a known or obvious consequence of his action.  *Id.*  "Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program."  *Connick*, 563 U.S. at 61. "Deliberate indifference" for purposes of failure-to-train ordinarily necessitates a showing of a pattern of similar constitutional violations by untrained employees.  *See Bryan Cnty.*, 520 U.S. at 409.  Therefore, to proceed on a failure-to-train theory, plaintiff must prove "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."  *Jenkins v.*

*Wood*, 81 F.3d 988, 994 (10th Cir. 1996) (quoting *Canton*, 489 U.S. at 390).  Notice of particular deficiencies in a training program is the crux of a failure-to-train theory because, "[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."  *Connick*, 563 U.S. at 62.

In the complaint, Ms. Barker alleges that the constitutional violations occurred due to Aurora's failure to properly train its police officers.  Docket No. 47 at 33, ¶¶ 228, 230.  Specifically, Ms. Barker argues that Officer Moss and Officer Diz were "not properly trained by Aurora regarding welfare check practices, on how and when to properly use physical force, and/or properly policing within the protections and privileges of the Fourth Amendment."  *Id*. at 13-14, ¶¶ 108-09.  She further alleges that the Aurora Police Department has a long history of using excessive force against people and therefore the City should have pursued reasonable methods for training and supervising officers.  *Id*. at 16, ¶¶ 118-119.

These arguments lack any supporting factual allegations providing a basis for Ms. Barker's failure-to-train theory.  Ms. Barker does not set forth any facts concerning how Officer Moss or Officer Diz were trained, who trained them, why their training was deficient, or how the incident could have been avoided with different training.  *See, e.g.*, *Sexton v. City of Colo. Springs*, 530 F. Supp. 3d 1044, 1072 (D. Colo. 2021) (finding the plaintiff's failure-to-train allegations insufficient where the plaintiff did not state how the officers were trained and who trained them); *Cook v. Whyde*, No. 20-cv-02912-PAB-STV, 2021 WL 4459051, at *16 (D. Colo. Sept. 29, 2021) (dismissing *Monell* claim for failure to allege specific facts concerning how the defendants were trained or why the

training was deficient); *Est. of Lobato by & through Montoya v. Correct Care Sols., LLC*, No. 15-cv-02718-PAB-STV, 2017 WL 1197295, at *7 (D. Colo. Mar. 31, 2017) ("Notice of particular deficiencies in a training program is the crux of a failure-to-train theory."); *Bark v. Chacon*, No. 10-cv-01570-WYD-MJW, 2011 WL 1884691, at *3 (D. Colo. May 18, 2011) (dismissing municipal liability claim where plaintiff had "generally allege[d]" that the individual defendants were not properly trained, but had not "allege[d] specific deficiencies in training and supervision, or explain[ed] how the incident described in the Amended Complaint could have been avoided with different or better training and supervision"). This alone is fatal to Ms. Barker's failure-to-train claim. *See Connick*, 563 U.S. at 62 (notice of particular deficiencies in a training program is the crux of a failure-to-train theory). Furthermore, the complaint does not allege other similar incidents involving Aurora police officers to demonstrate a policy of deficient training. *See generally* Docket No. 47; *see also Connick*, 563 U.S. at 62 (explaining the necessity of alleging a pattern of similar constitutional violations in the failure-to-train context).[4]

Ms. Barker argues that she sufficiently pled the existence of a municipal policy of failure to train because she referred in her complaint to the Colorado Attorney General's recent investigation, which found that the Aurora Police Department "has a pattern and practice of violating state and federal law through excessive force." Docket No. 62 at 6;

---

[4] In her response, Ms. Barker generally argues that only "minimal factual allegations" are required at this stage. Docket No. 62 at 5 (citing *Thomas v. City of Galveston*, 800 F. Supp. 2d 826, 842-43 (S.D. Tex. 2011)). Ms. Barker's reference to a district court case in Texas is unavailing because a plaintiff in the Tenth Circuit must adequately plead enough factual allegations to demonstrate an "(1) official policy or custom, (2) causation, and (3) state of mind." *Schneider*, 717 F.3d at 769.

Docket No. 47 at 15, ¶ 114.  However, Ms. Barker only cursorily referred to this report in one paragraph of her complaint and did not describe any specific findings of the investigation in her complaint, particularly any findings about the Aurora Police Department's training program.  *See* Docket No. 47 at 15, ¶ 114.[5]  Therefore, this brief reference to the investigation does not provide sufficient factual allegations for the failure-to-train theory.

Ms. Barker's response does not argue any other theories for an official policy or custom, aside from the failure-to-train theory.  *See generally* Docket No. 62.  To the extent Ms. Barker alleges a separate ratification theory of municipal liability, this claim would also fail.  Ms. Barker's second amended complaint briefly refers to Aurora's practice of ratifying excessive force and unlawful arrests.  *See* Docket No. 47 at 14-16, ¶¶ 112, 117, 121.  These allegations are conclusory and Ms. Barker has failed to provide any supporting factual allegations for a theory of ratification.  For example, the complaint does not identify the final policymaker who allegedly ratified the conduct.  *See Tivis v. City of Colo. Springs*, No. 19-cv-00867-KMT, 2020 WL 1166842, at *5 (D. Colo. Mar. 11, 2020) (dismissing *Monell* claim where plaintiff's complaint failed to identify a final policymaker); *Moss v. Kopp*, 559 F.3d 1155, 1169 (10th Cir. 2009) (affirming dismissal for failure to allege conduct was approved by official policymaker).

Because Ms. Barker has not plausibly alleged an official policy or a custom, the Court will dismiss her claims against Aurora without considering the causation or state-

---

[5] In her response, Ms. Barker mentions some specific findings of the Colorado Attorney General's investigation into the Aurora Police Department.  *See* Docket No. 62 at 6-7. However, Ms. Barker cannot amend her pleading by adding additional facts in her response.  *See Abdulina v. Eberl's Temp. Servs., Inc*., 79 F. Supp. 3d 1201, 1206 (D. Colo. 2015) (citing *Jojola v. Chavez*, 55 F.3d 488, 494 (10th Cir. 1995)).

of-mind elements of municipal liability.  *See Schneider*, 717 F.3d at 769; *see also Whyde*, 2021 WL 4459051, at *16 (dismissing Monell claim without considering causation or deliberate indifference because the plaintiff failed to plausibly allege an official policy or custom).  The Court will therefore grant the City's motion to dismiss plaintiff's fifth claim.

## IV.    CONCLUSION

It is therefore

**ORDERED** that Defendants Moss and Diz' Motion to Dismiss Plaintiff's Second Amended Complaint with Request for Trial by Jury [Docket No. 56] is **GRANTED IN PART** and **DENIED IN PART**.  It is further

**ORDERED** that all claims against Officer Moss and Officer Diz in their official capacities are **DISMISSED**.  It is further

**ORDERED** that claim four is **DISMISSED** with prejudice against Officer Moss and Officer Diz in their individual capacities.  It is further

**ORDERED** that the portion of claim two based on excessive force for kicking in plaintiff's front door is **DISMISSED** with prejudice against Officer Moss and Officer Diz in their individual capacities.  It is further

**ORDERED** that Defendant City of Aurora's Motion to Dismiss Plaintiff's Second Amended Complaint with Request for Jury Trial [Docket No. 54] is **GRANTED**.  It is further

**ORDERED** that all claims are **DISMISSED** with prejudice against the City of Aurora.  It is further

**ORDERED** that the City of Aurora is **DISMISSED** from this lawsuit.

DATED March 14, 2023.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge